Bradbury, J.
The contention between the parties assumes a two-fold form. One respects the *40 title that the defendant in error acquired to the bonds in controversy. If he acquired no title to them as against the obligor, nor against either of the consolidated companies into which the obligor became merged by the consolidation that afterwards occurred,- he must fail in the action. If his title is valid against the obligor, or against either of the consolidated companies formed before the bonds were negotiated, then the second contention arises: which relates to the lien claimed for these bonds, on the mortgaged property, this property having passed into the ownership of plaintiff in error.
The evidence discloses no marked dispute over the main facts of the case, and the trial court could have encountered no serious difficulty in ascertaining them. Doubtless, as the defendant in error contends, the evidence submitted to the trial court would have authorized the finding of some additional facts that bear favorably for him upon a general view of the equities of the case, but their character and importance were not controlling, and in the view we have adopted they become immaterial.
The finding of fact made by the court of common pleas was both comprehensive and minute, embracing many circumstances and details formal in their character, though doubtless most of them were indispensable to a determination of the contention between the parties. It covers thirty pages of the printed record. The repetition of only a small part of this statement is required as a basis for our conclusions. On November 1, 1864, TheColumbus and Indianapolis Central Railway Company, a corporation'under the laws of the states of Indiana and Ohio, authorized the execution of one thousand *41 of its bonds, each of the denomination , of one thous- and dollars, payable, November 1, 1904, bearing-seven per cent, interest, payable semi-annually; these payments of interest being evidenced by coupons attached to the bonds severally. These bonds were duly executed, being signed by the president, attested by the secretary of the company, and the corporate seal attached. They were made payable to William D. Thompson or bearer, in New York City. Each bond contained this provision : “This bond shall be transferable by delivery, or it may be registered as to its ownership on a registry to be kept by the company, and being so registered it shall then be transferable only on the books of the company until released from such registryon said books by its owner. This bond shall not become obligatory until it shall have been authenticated by a certificate annexed to it duly signed by the trustee. ’ ’ The bonds were secured by a mortgage conveying the roadway and other property of the makers to A. Parkhurst in trust for that purpose. It is a certificate of this trustee that is declared necessary to render them obligatory.
This authentication was duly made on each bond by the following certificate :
“I hereby certify that this bond is one of the series of bonds described in and secured by the deed of trust or mortgage above mentioned.
“A. Parkhurst, Trustee.”
The statement that the bonds should not become obligatory until thus authenticated is equivalent to a declaration that when duly executed by the company, and so authenticated, their obligatory character shall become complete. They then became *42 perfect in form, and by their express terms transmissible by mere delivery.
Eight hundred and twenty-one of these bonds were duly negotiated on behalf of the company. The remaining one hundred and seventy-nine, of which the thirty-six in controversy were part, were, as early as 1870, placed in the custody of .Benjamin E. Smith, the president of the company, and remained in his custody until the year 1875, when in November or December of that year he borrowed for his own purposes certain sums of money amounting to $48,000 from W. H. Newbold, Son & Co., a firm of brokers in the city of Philadelphia, for which he executed and delivered to them his individual notes, and at the same time falsely pretending to the said W. H. Newbold, Son & Co. that he was individually the owner of said bonds, delivered certain of said bonds, including the thirty-six bonds described in the plaintiff’s petition, to the said W. H. Newbold, Son & Co. as collateral security for the payment of his said notes.
Thereafter the said Smith renewed these said notes with the same collateral from time to time, until about the 14th day of January, 1878, when the bonds so held as collateral security were sold by the said W. H. Newbold, Son & Co. and the proceeds applied to the payment of said notes and the balance paid over to the said Smith, or for his use, and no part of the same was used for the benefit of said railway company.
At the time the said bonds were so pledged to the said W. H. Newbold, Son & Co. all the past • due coupons had been cut off, and while they were so held as collateral security the subsequent coupons as they came due were cut from the *43 said bonds and delivered to the said Smith, but the same never were presented for payment.
At the sale of said bonds the said W. H. New-bold, Son & Co. themselves became the purchasers of all said thirty-six (36) bonds, paying the full market price at the time of the purchase, and buying them in good faith, without knowledge .of any defect in them or any of them; and thereafter they sent the said thirty-six bonds to New York for sale. Plaintiff in the months of May, July and August, 1878, purchased said thirty-six bonds in good faith in the usual course of business, for valuable consideration, being about ninety cents on the dollar, which was at the time the usual market price for the bonds secured by said second mortgage, and without knowledge or notice of any of the unauthorized or fraudulent acts of said Smith concerning said bonds, and without any knowledge or notice that said bonds had not been sold by the said Columbus & Indianapolis Railway company and thereby became and is now the bona ficle holder and owner of said thirty-six bonds and the coupons thereto belonging, described in the petition; and that before said thirty-six bonds had been purchased by plaintiff, the railway company had not made default in the payment of interest on said thirty-six bonds, and no holder of said bonds prior to said plaintiff had elected that the principal sum thereof should become due.
At the time when the plaintiff purchased the said thirty-six bonds, the coupons belonging thereto, due May 1, 1878, were still attached to the said bonds and were unpaid.
On or about the 27th day of August, 1878, the plaintiff presented the said thirty-six bonds for registration to the secretary of the Union Trust *44 Company, New York, which company had been therefore designated by said Columbus,Chicago & Indiana Central Railway Company as its registering agent for said bonds in the city of New York authorized to register its bonds in the name of their holder, if requested by him to do so, or upon like request, to take them' out of the registry and make them again, payable to bearer; and the secretary then caused the same to be registered in the name of Charles R. Lynde. At the time . of said registration no inquiry was made by the said secretary as to whether or not the said bonds had been regularly issued by the said Columbus & Indianapolis Central Railway Company.
Prom the year 1871 until after the purchase by the plaintiff of the thirty-six bonds described in the petition, the plaintiff held and' owned other bonds secured by the said mortgage of the Columbus & Indianapolis Central Railway Company to Archibald Parkhurst, trustee, described in the petition, being- some of the 821 bonds herein described before. The said Columbus, • Chicago & Indiana Central Railway Company made default in the payment of the interest coupons upon said 821 bonds due on thefirst day of May, 1875, and on the first day of November, 1875 and the said interest coupons were not paid until after June 30, 1876, when the same were paid by or on behalf of the said receiver hereinbefore mentioned, all which facts were known to the plaintiff at the time he purchased the said thirty-six bonds described in the petition. No authority or consent was ever given by the board of directors of the said Columbus, Chicago & Indiana Central Railway Company to the issue or the sale of the said one hundred and seventy-nine bonds or any of them.
*45 Before this negotiation was had, the obligor, The Columbus & Indianapolis Central Railway Company had, by two separate schemes of consolidation, become merged into the Columbus, Chicago & Indiana Central Railway Company, which latter corporation, by force of the consolidations, had become the owner of the property of the obligor, which was pledged to pay these bonds. Said Benjamin E. Smith, being continuously the president of the successive companies, and as such president had the bonds in his custody. This negotiation and pledging of said bonds was had without the knowledge, consent or authority of said Columbus, Chicago & Indiana Central Railway Company, or of its constituent companies.
The title of defendant in error to the bonds in controversy rests upon the facts thus recited. Plaintiff in error contends, among other things, that the facts thus stated show that neither the maker of these bonds, nor the consolidated companies into which it became merged, consented to this sale or delivery of the bonds and as an owner can not be deprived of his property without his consent, no title-passed.
It is true these bonds were negotiated to Newbold and son without the knowledge or consent of the company that made them, or the knowledge or consent of any of the companies into which it became merged by the several consolidations mentioned. But such consent and knowledge is not indispensable to pass the title to n'egotiable instruments. Where this class of paper, complete in form and transmissible by delivery, is placed by the maker or owner in the custody of one, who is thereby clothed with an apparent power of disposition, and thé custodian avails himself of the oppor *46 tunity thus afforded, him. to negotiate it to an innocent party, the title of the holder is not to be tested by principies applicable to stolen securities, but by principles properly applicable to the transaction as it actually occurred. That the title to negotiable securities may pass by virtue of such transaction as the finding of fact shows occurred in respect to the negotiation of the bonds in question, is, we think, clear upon principle, and sustained by authority. Railway Co. v. Sprague, 103 U. S., 756; Fearing v. Clark, 16 Gray, 74.
Independently of the rules of law designed to protect and give currency to negotiable paper, those principles of natural justice universally ap- ' plicable to the affairs of mankind, when applied to this transaction would seem to demand the protection of the defendant in error as against the maker of the bonds, and all who stand in its shoes. He was wholly free from fault in connection with the transaction. Each bond contained a declaration of its transmissibility from hand to hand by mere delivery. He found them for sale before they were due, in the market where such securities are usually offered for sale, and bought them at their fair market value, without notice of any infirmity in their title. Soon thereafter he took them to the Union Trust Company, in New York City, the agents of the maker, specially appointed to register its bonds, and caused them to be registered in his name on its books. What more could even the highest degree of prudence or diligence demand of him?
On the other hand the maker of the bonds, a railway company, capable of acting’ through agents only, placed these bonds in the custody of its president, an agent clothed with high, though pos *47 sibly not clearly defined powers. The bonds were perfect obligations, bearing on their face a certificate of authentication by the trustee and containing an express declaration of their transmissibility7- from hand to hand by mere delivery. He was, up to and long after the time these bonds were negotiated, continued as president of the different consolidated companies as they were successively formed. The companies thus held him out to the world as one who could be trusted to transact matters of importance concerning their affairs. Under these circumstances what can be found tending to excite a doubt in the most cautious mind respecting his power to dispose of bonds so intrusted to him?
If the maker of these bonds, and those who must abide by their title, can shift the responsibility and consequent loss resulting from this transaction from themselves to the holder of the bonds, it must be by the application of some stern rule of law founded upon considerations of public policy.
The contention against the negotiability of these bonds rests upon a statute passed in 1820 (S. & C., 862), and in force when the bonds in question were made, and negotiated.
‘ ‘Section 1. Be it enacted by the general assembly of the state of Ohio, that all bonds, promissory notes, bills of exchange, foreign and inland, drawn for any sum or sums of money certain, and made payable to any person or order,. or to any person or bearer, or to' any person or assigns, shall be negotiable by endorsement thereon, so as absolutely to transfer and vest the property thereof in each and every indorsee successively; but nothing in this section shall be construed to make negotiable any such bond, note or bill of exchange, drawn payable to any person or persons alone, and not drawn to order, bearer or assigns.”
*48 In 1846, this court, notwithstanding the terms of the statute, held in Avery v. Latimer et al, 14, Ohio, 542, that a promissory note payable to bearer was negotiable by mere delivery, but that a sealed instrument in the same form was not a promissory note, and is only negotiable by endorsement. Cushman v. Welsh, 19 Ohio St., 536, and Osborn v. Kistler, 35 Ohio St., 99, assert the same rule respecting the necessity of an endorsement to transfer title to a sealed instrument in the form of a promissory note, payable to bearer.
In Avery v. Latimer et al., supra, the court was of opinion that the language of the statute, just quoted (S. & C, 862), was such that if it had been recently enacted, its terms would have compelled them to hold that an endorsement of a promissory note was necessary to its negotiability in all instances, whether sealed or not. But in deference to a long continued practice to the contrary the court held the endorsement to be unnecessary to the transfer of a promissory note (not under seal) payable to bearer. We think the same considerations,based on a similar long continued practice in regard to railroad bonds, together with the express declaration of transmissibility appearing on the face of the bonds in controversy, and the manifest necessity of the quality of negotiability by mere delivery to their availability to accomplish the object expected of them, would require us to hold them to be negotiable by mere delivery, even if of the opinion that they were sealed instruments, according to the strict construction of that statute. But whatever the court might hold upon the question just suggested, may be regarded as speculative, for we are of opinion that the attachment of the corporate seal did not stamp upon *49 them the character of sealed instruments within the meaning placed upon that term by the decisions of- this court before cited. Avery v. Latimer, et al., 14 Ohio, 542; Cushman v. Welsh, 19 Ohio St., 536, and Osborn v. Kistler, 35 Ohio St., 99.
In those cases the instruments were made by natural persons who signed their names and also affixed or adopted a private seal, thereby manifesting a purpose to place them in the class of sealed instruments, and the court dealt with them according to the character thus expressly stamped on them by the parties.
In the case of railroad, or other corporate securities, however, the attaching of a corporate seal bears a strong analogy to the signature of a natural person, and is its substantial equivalent. In view of She vast sums of money represented by this class of securities, and of the existence of a practice of passing them from hand to hand by delivery so universal and long continued, as to be within the common knowledge of every one, they should not be shorn of this valuable attribute on this account, unless the words of the statute and the former decisions of the court imperatively require it, which we do not think they do. Besides, the bonds in question are payable' in New York. The contract was to be performed there. All parties must be deemed to have had the law of the place of the performance of the contract in view, and we are cited to no statute or decision of the courts of that state, that take from these bonds the quality expressly given them in direct terms of transmissibility by delivery. We therefore hold the bonds to have been negotiable by delivery.
At the time Lynde, purchased the bonds in controversy, and for some years before, he owned *50 some of the eight hundred and twenty-one, conceded to be genuine. In 1875, more than two years before, Lynde purchased those in controversy, default was made in the payment of interest on those that were genuine, and as Lynde owned some of them, he was chargeable with notice of such default. This default, it is claimed, rendered them over due and therefore dishonored.
It is true - that the mortgage by which the bonds were secured, contained the following provision: ‘ ‘And it is further agreed by the party of the first part that in case the said company for the term of six months shall make default of the payment of its interest warrants or any of them, then the whole principle money contained in said bonds shall become due and payable. ?’
The default consisted in the non-payment of the interest due for May 'and November, 1875, and continued until June 30, 1876, a period of more than six months. The entire interest, however, was paid on the day last named. In the meantime no steps were taken to enforce any rights growing out of this default.
This payment of the overdue interest was made more than two years before the purchase by defendant in error of the bonds in controversy. Even if the holders of the bonds were chargeable with notice of this provision in the mortgage (no such provisions appearing on the bonds), and that provision was self operating so that a mere default of six months in the payment of an installment of interest dishonored the bonds by making them overdue, this taint should be regarded as removed by a subsequent payment of interest to the acceptance of all the bond holders, and therefore the *51 quality of negotiability should be deemed to be restored.
We are therefore of opinion that the title of defendant in error to the bonds in controversy is valid.
We now come to the question respecting the lien claimed for these bonds upon the property mortgaged to secure them, which property has passed into the ownership of plaintiff in error.
The ease of Baily v. Smith, 14 Ohio St., 396, is cited by plaintiff in error, as decisively determining the question of the lien of the bonds in controversy, upon the mortgaged property, adversely to the claim of a lien. We are not disposed to depart from the doctrine established by that celebrated case; it has become a rule of property in this state that should not be lightly disturbed and besides is founded upon considerations that appeal strongly to feelings of natural justice. That case does not deny the right of a bona fide holder of negotiable paper to enforce it against the maker, though the latter may have been induced by fraud to make or part with it, but it does deny the right of such holder to enforce a mortgage given to secure such paper if the mortgage also was procured by fraud. In that case the note and mortgage were both procured from the maker by fraud, and that circumstance is the predicate of the decision. What the decision might have been, if fraud had intervened only in respect to one of the two instruments present in that case, is a subject about which we may speculate, and upon which different minds might reach opposite conclusions. The reasoning of the learned judge as I gather it from his opinion, leads me to the belief that he would have reached the same conclusion, *52 had the mortgage alone been tainted with fraud, but possibly to a different one if the mortgage had been free from fraud, though the note was tainted.
However this may be, there are considerations growing out of the nature of the transaction in that case that distinguish it from, the one under consideration. That transaction occurred between private persons; and consisted of a single note, . secured by a mortgage on a tract of land. The learned judg’e having in view those circumstances said: “Now, mortgages are not necessities of commerce. They have none of the attributes of money; they do not pass in currency in the ordinary course of business; they are securities or documents for debts used for the purpose of investments and unavoidably requiring from those who would take them with prudence and safety, enquiry into the value, condition and title of the property upon which they rest; nor have we the least apprehension that commerce will be impeded by requiring the further enquiry of the mortgagor, whether he pretends to any defense before a court will foreclose his right to 'defend against those which have been obtained by force or fraud. * * * A long experience has demonstrated that they are not necessary instruments of active trade and business, and we but follow in the footsteps of the oldest and wisest judges when we say that the harsh rule which excludes equities, and often does injustice for the benefit of commerce should not be applied to them. * * * If they are assigned either expressly or by legal implication, the assignee takes only the interest the assignor had in the instrument” *
This language and course of reasoning, perfectly appropriate to the transaction then under *53 consideration, would be strangely out of accord, in discussing’ the principles that should determine the rights of bona ficle holders of railroad bonds. These latter are instruments of trade and commerce in the broad sense of those terms; they are designed for sale in the money markets of both Europe an d Amer i ca; they are made payable to bearer for the express purpose of facilitating their negotiability; in the case of the bonds under consideration they declare on their face the fact of their transmissibility by mere delivery. The mortgage is made to a trustee for the benefit of every bond into whomsoever’s hand it may chance to pass, and its sole purpose is to give value to these bonds inthe'money markets of the world. Prospective purchasers of these bonds do not and cannot make such specific enquiry, and examination into the condition of the mortgaged property, as may be made by a purchaser of a note and mortgage under the circumstances supposed by the learned judge.
It might be entirely practicable, and the dictates of prudence might require of one about to purchase a note and mortgage of the mortgagee that he enquire of the maker the circumstances under which they originated, but to require this enquiry of one who in a distant city is about to purchase a railroad bond offered for sale in the market, would.be to defeat the purpose for which they were, designed. Therefore,. we do not think the case of Baily v. Smith, supra, applicable to the case under consideration.
The roadway and other property pledged by the mortgage to secure the payment of these bonds, subsequent to the making of the mortgage passed by two successive railway consolidations, one *54 made in 1867, the other in 1868, into the ownership of a corporation known as the Columbus, Chicago & Indiana Central Railway Company. This latter railway company, by the consolidations mentioned, thus became the owner of the property pledged for the payment of the bonds in controversy, as well as of the property of its other constituent companies. The new company executed two mortgages on its entire property, one in Februarjql868, the other in December of the same year, under the first of the two, bonds to the amount of about ten million dollars, wer e issued, and under the other, bonds aggregating less than five million dollars, were issued. These two mortgages were duly recorded and no question is made respecting their validity. In 1869 the roadway and property of this consolidated company was leased for a term of ninety-nine years, renewable forever to the Pittsburg, Cincinnati & St. Louis Railway Company, and on or about February 1, 1869, the latter company went into possession and continued to occupy and operate the road until after its sale in 1883, upon the foreclosure of the two last mentioned mortgages.
In 1875 actions were begun in the circuit court of the United States for the Southern District of Ohio, in the circuit court of the United States for the District of Indiana, and for the Northern District of Illinois, by the trustees in the first of the two last named mortgages to foreclose, the same. To which action the Columbus, Chicago & Indiana Central Railway Company (the consolidated company that made the two last mortgages), the trustee in the mortgage last made, and the trustee in the mortgage made to secure the bonds in controversy were each made parties. Receiv *55 ers were appointed by the court, to whom the consolidated company (The C., C. & I. Central Railway Company), on May 25, 1875, conveyed the entire property covered by the mortgages pursuant to an order of court made in the actions, but subject to the right of the lessee of the road to continue in its possession, control and management. This deed was not recorded and the defendant in error, Lynde, had no actual knowledge of its existence until 1891. In November, 1882, decrees were rendered in these actions for the sale of the mortgaged property.
By the terms of this decree the entire interest that the Columbus, Chicago & Indiana Central Railway Company, the mortgagor in the two last mortgages, had in the mortgaged property, and all the rights of the mortgagees in the two last mortgages, were ordered to be sold, free from all liens acquired during the litigation, but the decree expressly provided that it should not affect or prejudice prior liens, one of which was the mortgage made in 1864 to Parkhurst to secure the one thousand bonds of which the thirty-six involved in this action are part.
In February, 1883, the property was sold under this decree, to William S. Scott, and his associates, who shortly thereafter conveyed it to the Chicago, St. Louis & Pittsburgh Railroad Company. By a consolidation of this company with the Pittsburgh Cincinnati & St. Louis Railway Company, the lessees of the road, the plaintiff in error was formed and thereby became vested with the property embraced in the mortgage made in 1864, to secure the one thousand bonds, which, as we have seen, included those in controversy.
*56 I£ the equities of the defendant in error, growing out of the circumstances, before noticed, under which the bonds in controversy were negotiated, were so clearly and materially stronger than those favorable to the company that made, and the company that offered them to be thus negotiated as to authorize a decree declaring1 them to have a ben upon the property originally pledged for their payment, what circumstance appears in the proceedings by which this property came into the ownership of plaintiff in error, that should operate to destroy this lien. The defendant in error is not chargeable with any actual neglect or omission of diligence in connóction with the matter, nor of any actual notice of the proceedings.
The several transfers of the property, caused by the different railroad consolidations, would not affect the lien, for the statutes authorizing them expressly provides that: “All rights of creditors, and all liens upon the property of either of such companies, shall be preserved unimpaired, and the respective companies may be deemed to be in existence to preserve the same; and all debts, liabilities, and duties of either of said companies shall forthwith attach to the new company, and be enforced ag’ainst it to the same extent as if such debts, liabilities, and duties had been contracted by it. ”
Smith, who wrongfully negotiated these bonds, continued to be president of the several companies upon their successive consolidations, until about the time of the judicial sale before mentioned, and each of them therefore became successively liable for what they carelessly suffered him to do in the matter.
The circumstance that the particular railroad company that executed the mortgage and made the *57 bonds under consideration, went out of active existence before the bonds in controversy were negotiated by Smith, becomes wholly immaterial in the light afforded by the provisions of this statute. The consolidated corporation succeeds, not only to every debt and liability of each constituent company, but to their duties also. It therefore succeeded to all the duties pertaining to these unissued bonds that rested upon the company by whom they were made.
Respecting- the effect that the judicial sale should have been upon this lien. Independently of the rule of caveat emptor that is applied to purchasers at such sales, the sale under consideration was made under a decree that expressly provided that the lien of the mortgage that secured these bonds was not to be affected or prejudiced by the decree or sale. It is true that the purchasers at the sale supposed these bonds had not been negotiated, but they knew a thousand of the bonds had been authorized, and that their form was such that they would pass from hand to hand by mere delivery, and made no inquiry at all about them. Their production and cancellation could have been demanded, and in prudence should have been. If their production had been demanded the fact that they were outstanding- would have been revealed, and the lien of the holder preserved. One who neglects so obvious a precaution should abide the consequences.
The same considerations apply to the conveyance afterwards made by the purchasers at the judicial sale, to the Chicago, St. Louis and Pittsburgh Railroad Company. If the purchase by Scott and his associates is not to be regarded as really made on behalf of the company, to which the *58 property was afterwards conveyed, nevertheless the latter received the deed, without inquiry concerning the bonds in question, and it is chargeable with notice of the existence of the mortgage, the character of the bonds it secured, and that they might be outstanding in the hands of innocent purchasers.
Upon any adjustment of the equities growing out of the transaction we discover no circumstance that relieves the plaintiff in error iron the rule of caveat empfor.
The doctrine of Us pendens, however, is invoked to defeat the lien of defendants in error.
In November or December 1875, when the bonds in controversy were pledged by Smith, for his personal obligation, and afterwards, in 1878, when the defendant in error bought them, the actions heretofore referred to, brought in February, 1875, to foreclose the subsequent mortgages were pending, and the property had been placed in the hands of receivers. Under the doctrine of lis pendens, plaintiff in error insists that the purchaser of the bonds was chargeable with notice of these actions, and during their pendency could acquire no lien upon property in the hands of the court. These actions were pending in the United States Court in Illinois, Indiana and Ohio, while they embraced the property pledged to secure the payment of bonds in controversy, no relief was sought or obtained in respect to these bonds. In view of this circumstance and of the knowledge of their existence, which we have seen should be imputed to the purchaser at the judicial sale, and to plaintiff in error, and their omission to call for the production and cancellation of any bonds that might not have been negotiated, would make the application of *59 the doctrine of Us pendens to the defendant in error extremely harsh, even if the bonds were not negotiable. However, as the doctrine of Us pendens does not apply to negotiable paper, purchased before due, in due course of business, that question requires no further consideration. Stone v. Elliott, 11 Ohio St., 252.
The bonds in controversy were not negotiated until 1875, and if their lien dates from that event, the two issues of bonds under the subsequent mortgages would be entitled to a prior lien on the property, and the aggregate amount of those two subsequent issues was greater than the sum realized from the sale of the property under the decree of foreclosure. If all that was true the defendant in error would be entitled to demand a resale of the property, for the mortgagemade to securehis bonds was not affected by the decree and sale under which plaintiff in error claims title.
But the date of the lien of the bond does not depend upon the date of their original negotiation. The entire series stand upon a footing of exact equality in this respect, the first one issued has no better or earlier lien that the last one. To distinguish between and give priority of lien, among a series of railway, or other bonds, secured by the same mortgage, and in the hands of different bona fide holders, according to the time each may have been issued, would contravene the manifest design of the maker. It would also be wholly impracticable, leading to interminable disputes, besides stamping upon each bond a doubt respecting the share of the proceeds of the mortgaged property, that would be applied to its payment. If issued early it would be paid in full, perhaps; if late, might receive nothing.
*60 The several propositions urged upon our consideration to defeat the claim of defendant in error we find to be unsound in principle or inapplicable to the facts as they were found by the court of common pleas.

Judgment affirmed.