## Railway Company *v.* Sprague.

1. A mortgage executed by a railway company, to secure its bonds, provides that, in case of default for six months in the payment of the interest upon either of them, the entire amount of the debt secured "shall forthwith be-come due and payable," and that the lien of the mortgage may be at once enforced. The bonds themselves declare that, "in case of the non-payment of any half-yearly instalment of interest which shall have become due and been demanded, and such default shall have continued six months after demand," the principal of the bond shall become due, with the effect provided in the mortgage. *Held*, that, the mortgage being a mere security, the terms of the bonds must control in determining when the principal is payable.

2. Overdue and unpaid interest coupons do not of themselves make the bond to which they are attached dishonored paper. *Cromwell* v. *County of Sac* (96 U. S. 51) cited and approved, and *Parsons* v. *Jackson* (99 id. 434) distin-guished.

3. The facts in this case show that the appellee is a *bona fide* holder of the bonds in controversy.

APPEAL from the Circuit Court of the United States for the District of Indiana.

The facts are stated in the opinion of the court.

*Mr. Joseph E. McDonald* and *Mr. James Emott* for the ap-pellant.

*Mr. Clarkson N. Potter* for the appellee.

MR. JUSTICE WOODS delivered the opinion of the court.

This was a suit in equity in which the Union Trust Com-

pany of New York was complainant, and the Indiana and Illinois Central Railway Company and others were defendants. It was brought for the foreclosure of a mortgage upon the property of the railway company, and it resulted in a decree of foreclosure and sale. - An interlocutory decree directed a master of the court to ascertain and report the names of all the holders of bonds and coupons, which had been duly issued under the mortgage, and were entitled to share in the proceeds of the sale.

Under this order of reference Mrs. Henrietta P. Sprague, the appellee, presented a claim to be the owner and holder of seventy-five bonds, numbered from 629 to 703 inclusive, of $1,000 each, with coupons attached. The railway company objected to the allowance of her claim. The master heard the proofs of the parties and the arguments of their counsel, and reported that she had made sufficient proof of her ownership of the bonds in question, and that they were entitled to be paid out of the purchase-money of the road. To this report the railroad company filed exceptions. The court, at the May Term, 1878, overruled the exceptions, and entered a decree directing, among other things, that the seventy-five bonds of the appellee, with the coupons thereto annexed, should be allowed as valid, and as secured equally with the other outstanding bonds by the mortgage foreclosed, and that they should be paid their *pro rata* shares out of the proceeds of the foreclosure. From this order, and this part of the foreclosure decree in the cause, the railway company brings this appeal.

Mrs. Sprague was the widow and administratrix of John H. Sprague, deceased. J. Elliott Condict had long been a friend of her husband, doing business in New York in railway securities, under the style of " Condict & Co., bankers and brokers."

In February, 1870, she loaned Condict $25,000, for which she took his note. Before its maturity he advised her to buy, and offered to sell her, $75,000 of the first-mortgage bonds of the Madison and Portage Railroad Company. She made the purchase for the price of $60,000, and paid that sum partly by giving up to him his note to her for $25,000 money loaned, and the residue in securities at the market price. This purchase was made in November, 1870.

The Madison and Portage Railroad Company failing to pay interest on its bonds, she, on June 24, 1871, at Condict's instance, returned them to him, and received from him in exchange seventy-five bonds for $1,000 each of the Indiana and Illinois Central Railway Company.

These bonds were dated April 1, 1870, and secured by a mortgage or deed of trust of the same date. At the time of the exchange there were attached to each of the bonds which Mrs. Sprague received all the coupons, beginning from the date of the bonds, sixty in number. Of these coupons two, one payable Oct. 1, 1870, and one payable April 1, 1871, for thirty-five dollars each, were past due and unpaid. The bonds contained this provision : " In case of the non-payment of any half-yearly instalment of interest, which shall have become due and been demanded, and such default shall have continued six months after demand, the principal of this bond shall become due in the manner and with the effect provided for in the trust deed securing its payment." The bond also recited that it, together with the residue of two thousand seven hundred and fifty bonds, was secured by a deed of trust or mortgage, dated the first day of April, 1870. The mortgage contained the following clause : " In case default be made for six months in the payment of any interest upon either of said bonds when the same shall become due and payable, the whole principal sum in all and each of said bonds shall forthwith become due and payable, and the lien or incumbrance hereby created for the security and payment of such bonds may be at once enforced, anything herein to the contrary notwithstanding."

Before making the exchange of bonds, Mrs. Sprague had placed the management of the affair in the hands of Mr. John M. Whiting, as her counsel, who, in her behalf, investigated not only the question of the value of the Indiana and Illinois Central Railway bonds, but also of the right of Condict to sell them. At the time of this investigation the Indiana and Illinois Central Railway was not a completed but only a projected road. Condict was vice-president and acting president of the company. There was an executive committee consisting of three members besides the president. These were Condict, Seaman, and Lazare.

Five hundred bonds of $1,000 each, secured by the mortgage of April 1, 1870, had been executed. Before they could be issued they had to be countersigned by the Union Trust Company. They were so countersigned and delivered to the railroad company, and were in all respects regularly executed.

In June, 1871, three hundred of the bonds were delivered by the treasurer of the company to Condict and Lazare, members of the executive committee. They delivered two hundred of them to parties to whom they belonged. The residue remained in the possession of Condict. He did not appear to have any express authority from the company to sell or dispose of them, but claimed to have a lien on them for advances made to the company. There was evidence tending to show, however, that the company had never received consideration for the bonds transferred to Mrs. Sprague, but none to show that she, so far as it regarded any direct notice to her personally, was not a *bona fide* purchaser.

Whiting, in his testimony touching what he learned of Condict's right to transfer the bonds, said : " He came to me with statements, and upon them I acted. He asserted his entire capacity to make the exchange ; that he owned the bonds ; that he had made advances to the company ; that they were his by the highest possible title, and made all the asseverations under my very sharp and close cross-examination. He claimed to own the bonds." Whiting also testified as follows : " Seaman," the colleague of Condict on the executive committee, " assured me of Condict's right to assign them," the bonds. " My memory is very active on this point. He sustained him," Condict, " in every regard."

The error complained of in the part of the decree appealed from is this : It being established by the evidence and reported by the master that the company had never received any value for its bonds either from Mrs. Sprague or any other person, the court erred in holding that she was a purchaser for value and without notice, and that the bonds were instruments of such a character and in such a condition as to enable her to enforce them against the company, notwithstanding the fact that it had received no value for them.

It is not disputed that they, when first executed and made

ready for circulation, had all the qualities of commercial paper. The contention of the appellant is that Mrs. Sprague was not a purchaser in good faith and for value.

It seems to be conceded, and the evidence establishes, that no facts were known to her in relation to them other than those which came to the knowledge of her agent, Whiting. Of course she was bound by what he knew. Does the knowledge of the facts learned by him, and which it is presumed he communicated to her, make her a purchaser in bad faith?

Two facts must be taken as established: *First,* Condict's custody of the bonds was lawful. The appellant admits that it placed them in his possession for safe keeping. *Second,* There can be no question that Mrs. Sprague paid full value for them.

Possession of negotiable bonds carries with it the title to the holder. *Murray* v. *Lardner,* 2 Wall. 110. Mrs. Sprague, therefore, bought the bonds of a person presumptively the owner, and paid for them a full and valuable consideration.

Condict was an officer of the company, and as such had possession of the bonds. If he had told Mrs. Sprague or her agent that he was selling the bonds for the company and as its agent, and had then applied them to the payment of his individual indebtedness to her, her purchase would have been made in bad faith. But this is not the case. Having possession of them, and being *prima facie* their owner, he asserted to her agent in the most positive manner that they were his property. The fact that he was an officer of the company did not of itself preclude him from dealing in them, or throw the slightest suspicion on his title.

The question, therefore, and the only question in the case is, Was there anything upon the face of the bonds and of the mortgage which secured them to put the purchaser on notice? The appellant asserts that there was; that attached to each of the bonds sold to Mrs. Sprague were two unpaid coupons, due respectively October, 1870, and April, 1871, and that this fact, by the terms of the bonds and of the mortgage which secured them, rendered the principal due and payable, and that as a consequence, when she purchased them, they were dishonored paper.

There appears to be a difference between the terms of the bonds and of the mortgage. The mortgage provided, that upon non-payment of interest for six months the principal of the bonds should become due, whether demanded or not. On the other hand, the bonds declared that in case of the non-payment of any half-yearly instalment of interest which had become due and had been demanded, if such default should continue six months after demand, the principal of the bond should become due. A copy of the bonds was set out in full in the mortgage.

The bonds being the principal thing containing the obligation of the company, and the mortgage a mere security to insure the performance of that obligation, the terms of the bonds should control.

Therefore a demand for the payment of her coupons and a failure to pay for six months were necessary to make the principal of the bonds payable. There having been no demand of the overdue coupons, it follows that by the terms of the bonds the principal sum was not due when Mrs. Sprague purchased.

The controversy, therefore, is reduced to this: Did the mere presence upon the bonds purchased by Mrs. Sprague of two past-due unpaid interest coupons make the bonds dishonored paper?

Coupons are separable obligations for the interest payable upon demand. It constantly occurs that they are not demanded for weeks and months, and sometimes years, after they are due. As they bear interest after maturity, it will frequently happen that the owner of a bond who holds it as an investment will keep the coupon for the same purpose.

Bonds executed by a railroad company may not be put upon the market until one or more coupons have matured. The company may cut them off when it sells the bonds, or leave them on to be accounted for in the purchase.

Negotiable bonds have been used as a means of raising money, not only by railroad companies, but by the national government, states, counties, and cities. To hold that the moment an unpaid coupon is left on a bond its character and negotiability are changed would greatly embarrass the

traffic in such securities and lead to endless uncertainty and confusion.

The mere presence, therefore, of two unpaid coupons upon the bonds purchased by Mrs. Sprague was not of itself sufficient evidence of the dishonor of the bonds to which they were attached.

This point has been expressly ruled by this court in *Cromwell* v. *County of Sac*, 96 U. S. 51. In that case, the court, speaking by Mr. Justice Field, said: " The non-payment of an instalment of interest when due could not affect the negotiability of the bonds or of the subsequent coupons. Until their maturity a purchaser for value, without notice of their invalidity as between antecedent parties, would take them discharged from all infirmities." To the same effect see *National Bank of North America* v. *Kirby*, 108 Mass. 497, and *Boss* v. *Hewitt*, 15 Wis. 260.

In *Parsons* v. *Jackson* (99 U. S. 434), the bonds of the railroad company which were the subject of controversy had never been issued, but had been stolen from its office. They were made payable either in New Orleans, New York, or London, as the president of the company might by his indorsement on the bonds determine. They did not contain his indorsement designating the place of payment; they were offered in the New York market and sold for a very small consideration. Coupons for several years, due and unpaid, were attached to them. The court held that all these circumstances affected the purchaser with notice of the invalidity of the bonds.

It is true the court said that the presence of the past-due and unpaid coupons was of itself an evidence of dishonor sufficient to put the purchaser on inquiry. But the case did not turn on this circumstance alone. There were other significant indications of the invalidity of the bonds, and the opinion must be restricted to the case before the court.

But conceding for the sake of argument that the possession of two unpaid coupons on the bonds purchased by Mrs. Sprague had been sufficient to put her on inquiry, she can only be charged with knowledge of the facts which she might have learned by inquiry.

Investigation would have disclosed to her, as the record

shows, that the construction of the road of the company by which the bonds were issued was just begun; that of the twenty-seven hundred and fifty bonds, for one thousand dollars each, which the mortgage was executed to secure, only five hundred had been signed and prepared for circulation; that these bonds had not been put upon the market for sale, but that a part of them had been used as collateral security for debts due from the company, and that those sold to her had not been put in general circulation, but, after their execution, had been turned over to Condict, the vice-president of the company, who, on account of his advances to it, claimed to be their owner, and that none of the coupons on any of the five hundred bonds had been paid. If, therefore, Mrs. Sprague had investigated the reason why the two past-due coupons, on the bonds which she purchased, had not been paid, these facts would have afforded a most satisfactory explanation.

"The party who takes negotiable coupon bonds, before due, for a valuable consideration, without knowledge of any defect of title and in good faith, holds them by a title valid against all the world. Suspicion of defect of title, or the knowledge of circumstances which would excite such suspicion in the mind of a prudent man, or gross negligence on the part of the taker at the time of the transaction, will not defeat his title. That result can be produced only by bad faith on his part." *Murray* v. *Lardner*, 2 Wall. 110.

"Bonds for the payment of money, with interest warrants attached, are everywhere encouraged as a safe and convenient medium for the settlement of balances among mercantile men; any course of judicial decision calculated to restrain or impede their free and unembarrassed circulation would be contrary to the soundest principles of public policy.

"Such instruments are protected in the possession of an indorsee, not merely because they are negotiable, but also because of their general convenience in mercantile affairs." *Smith* v. *Sac County*, 11 Wall. 139.

The inference to be drawn from these authorities, when applied to the facts in this case, is that Mrs. Sprague was a *bona fide* purchaser for value of the bonds transferred to her by Condict.

Our conclusion, therefore, is that the Circuit Court was right in directing a *pro rata* payment to be made on her bonds out of the proceeds of the property in which they were secured.

*Decree affirmed*