WHITRIDGE et al. v. MT. VERNON WOODBERRY COTTON DUCK CO.
et al.

(District Court, D. Maryland.    December 20, 1913.)

1. CORPORATIONS (§ 473*)—BONDS—INTEREST PAYABLE FROM INCOME—RIGHT
   TO MAKE RESERVATION FOR DEPRECIATION OF PROPERTY.

   A manufacturing corporation issued first mortgage bonds and also
   cumulative income bonds secured by a second mortgage on all its prop-
   erty.    The latter bonds stated that they did not "bear interest uncon-
   ditionally but only out of the income of the company, if sufficient, realized
   and remaining after the payment of all taxes, rentals, operating or cur-
   rent expenses and losses, necessary repairs, maintenance," and the in-
   terest on the first mortgage bonds.    The mortgage expressly included in
   the items so specified "charges for depreciation by age or wear."    The
   interest was payable semiannually and was cumulative.    Held, that such
   provision of the bonds must also be construed to authorize the company
   to maintain its capital unimpaired, and to that end to reserve from its
   gross income during each semiannual period in addition to the expend-
   itures enumerated a sufficient sum to make good losses from deprecia-
   tion of its property before setting apart the portion applicable to the
   payment of interest on the bonds.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1842–1853,
   1855; Dec. Dig. § 473.*]

2. CONTRACTS (§ 116*) — PUBLIC POLICY — CONTROLLING STOCKHOLDER OF AN-
   OTHER CORPORATION.

   A corporation, which owned a controlling interest in the stock of an-
   other corporation operating a number of manufacturing plants, entered
   into a contract with a third corporation of which it owned all the stock,
   by which it made the latter exclusive selling agent for 10 years, at a
   stated commission for all its products of the "several mills owned or con-
   trolled" by it.    The manufacturing company was not a party to the con-
   tract, but its products were sold through such agency for a number of
   years, and it was charged the contract commissions therefor.    Held, that
   so far as it undertook to bind such company the contract was contrary
   to public policy and void, and that bondholders of the company who were
   dependent on its income for payment of interest on their bonds were en-
   titled to an accounting from the stockholding corporation, as trustee,
   for any profits made by it through the sale thereunder of the company's
   products.

   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 542–552; Dec.
   Dig. § 116.*]

3. CORPORATIONS (§ 473*)—BONDS—INTEREST PAYABLE FROM INCOME—SUIT TO
   DETERMINE RIGHTS OF HOLDERS.

   Complainants were owners of bonds of one of the defendant corpora-
   tions the interest on which was payable from income only, and they had
   received but a small part of the interest due for a number of years.
   The other defendant corporation was owner of about 96 per cent. of the
   stock of the first and practically controlled its operations and also owned
   about the same per cent. of the same issue of bonds.    Complainants al-
   leged that certain items of expenditures, not large in number, which
   should have been charged to the second defendant or its predecessor
   whose liabilities it assumed, had been improperly charged against the
   earnings of the first corporation, reducing the amount of income which
   should have been applied to interest.    Held that, owing to the relations
   between the defendants, the charges involved should be closely scruti-
   nized, and that the burden of proof should not be imposed on complain-
   ants, but defendants, who had knowledge of the facts, should explain
   the same fully; also, that for the same reason, and because the owner-

ship of such a very large proportion of the bonds by the second defendant deprived complainants of the benefit of provisions of the mortgage for their protection, the court, after determining the present rights of the parties, would retain jurisdiction of the case to decide any future questions which might arise between the parties.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1842–1853, 1855; Dec. Dig. § 473.*]

In Equity. Suit by William Whitridge, Lemuel T. Appold, and Henry Williams against the Mt. Vernon Woodberry Cotton Duck Company, the Consolidated Cotton Duck Company, and the International Trust Company of Maryland, trustee. On exceptions to report of master. Decree for complainants.

Charles Morris Howard and William L. Marbury, both of Baltimore, Md., for complainants.

Bond, Robinson & Duffy, of Baltimore, Md., for Mt. Vernon Woodberry Cotton Duck Co.

Lemmon & Clotworthy, of Baltimore, Md., for Consolidated Cotton Duck Co.

Gans & Haman, of Baltimore, Md., for International Trust Co.

ROSE, District Judge. All three defendants are corporations. Two of them, viz., the Mt. Vernon Cotton Duck Company and the Consolidated Cotton Duck Company, hold their charters from the state of Delaware. For brevity the former will be called the "Mt. Vernon," the latter the "Consolidated."

The plaintiffs are citizens of Maryland. They hold 164 out of 6,000 income bonds issued by the Mt. Vernon. The third defendant is the International Trust Company of Maryland. It is the trustee under the mortgage securing the income bonds. It is a Maryland corporation. The plaintiffs expressly say that they ask no relief against it. It is therefore either a nominal party, the citizenship or state of incorporation of which is immaterial, or else its proper position on the record is that of a plaintiff. It will be referred to as the trustee.

The income bonds provide for the payment of cumulative interest, if earned, at the rate of 5 per centum per annum payable semiannually. These bonds were of the denomination of $1,000 each. The suit was brought August 9, 1909. Eight years had then elapsed since July 1, 1901. If the Mt. Vernon had been prosperous, $400 might in that time have been paid as interest on each bond. Only $100 was. The plaintiffs claim that the remaining $300 a bond, or a material part of it, was in fact earned but has been wrongfully withheld from them.

The Mt. Vernon was incorporated June 23, 1899. It was formed for the purpose of buying and operating 14 different mills which had been theretofore engaged in the production of cotton duck. It was said that those mills made 90 per cent. of all the cotton duck produced in this country. The plan under which the Mt. Vernon was launched called for the creation of $8,000,000 of first mortgage 5 per cent. bonds ($1,000,000 of which were to be retained in the company's treasury to provide for its future needs), $6,000,000 of 5 per cent. cumulative in-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

come bonds, and $9,500,000 of capital stock. The par value of the securities which were to be at once floated was thus $22,500,000. An underwriting syndicate bought the $7,000,000 first and the $6,000,000 income bonds, paying for them $11,275,000. The price realized by the company for its first mortgage bonds was 92½ and for its income bonds 80. It gave the syndicate as a bonus $3,250,000 of its stock. Its actual resources as against its nominal capitalization of $22,-500,000 were $11,275,000 cash and the remaining $6,250,000 par value of common stock. Out of these it paid for the mills it was formed to buy, and compensated the promoters who had secured options on them and who had brought about its own organization.

There are some things in the testimony which at least suggest that the bulk, if not all, of the $6,250,000 of common stock which did not go to the underwriting syndicate was received by the promoters. It appears probable that the actual price obtained by the former owners of the tangible property acquired by the Mt. Vernon did not exceed, if it equalled, the $11,275,000 cash paid in by the syndicate. None of these former owners were under any legal compulsion to sell. The prices accepted must have been at least all that they thought their properties were worth to them. Except in one instance, the record does not show how the sum paid by the Mt. Vernon for the mills which it bought compared with the cost of those mills to its vendors. That case may not be typical. It is suggestive. The mill in question for the six years preceding the organization of the Mt. Vernon never paid a dividend. One of 3 per cent. was paid by it a few days after the Mt. Vernon was incorporated and a few days or a few weeks before it was transferred to the latter company. It cost the Mt. Vernon $237.50 for each $100 share of its stock.

The period when the Mt. Vernon came into being was that immediately following the Spanish-American War. The reaction from the long period of depression which had followed the panic of 1893 was at its height. In those days many thought that a number of different business properties if combined in a single ownership would be worth several times as much as the aggregate of their individual values if they were to be separately operated. It might be, and often was, the case that the large company could, if it were so minded, duplicate all the old factories and equip them with the most modern appliances for a fraction of the price it paid their former owners. Such fact was regarded as immaterial. Fortune in finance, as in other things, sometimes favors the bold, provided that they know when to let go as well as when to take hold. By a coincidence which has been frequently noted in like cases, the statements issued by the Mt. Vernon during the early months of its existence were very encouraging. Interest on both the first and the income mortgage bonds were paid. Dividends on the capital stock were reported earned and were declared. With the coming in of the new century, or a few months earlier, things took on a different complexion. The Mt. Vernon's brief period of real or apparent prosperity ended. It was without sufficient working capital. Its credit was impaired, if not destroyed. The services of financial doctors had to be called in. The treatment prescribed was

the formation of another company. This new concern was to buy three or four mills which had not gone into the first company. It was to pay cash for them. They were clear of important incumbrances. One of them had a large amount of quick assets. This second Richmond was known as the United States Cotton Duck Corporation. It will be spoken of as the "United States." It was a New Jersey creation. It was not to issue bonds. Its capital was to be in the form of common and preferred stock. It was hoped by purchase or exchange to acquire all the capital stock of the Mt. Vernon and to induce the holders of the income bonds of the latter to exchange them for preferred stock of the United States. If the new mills could be bought for less than their worth, something substantial would have been accomplished. If the price paid for them was equal to or in excess of their value, their acquirement was not in itself a gain, except, perhaps, as a bait to draw into the enterprise fresh capital which otherwise could not have been tempted in that direction.

The United States was organized. It bought the mills in question. It acquired an overwhelming majority of the stock of the Mt. Vernon, but the holders of the income bonds of the latter were not willing to exchange them for the preferred stock of the new company. For some four years the United States, as the owner of the new mills, in its own right and as the holder of the great majority of the stock of the Mt. Vernon, directed the business of both corporations. In the spring of 1905 things again came to such a pass as to lead those in actual control of the companies to believe that some new scheme to diminish the fixed charges and to increase the credit of the concerns was imperatively necessary. Again they sought relief in the formation of a new company, the third, the defendant, the Consolidated. It was hoped that it might do what the United States had failed to accomplish. The latter, it is true, had brought all the mills under what was in fact a single control; but in legal theory there were still two companies. It had not been able to get rid of the Mt. Vernon income bonds. In any event, and on any theory of the rights of the parties to this litigation, it may be said that down to the spring of 1905 experience had abundantly shown that, capitalized and managed as it was, the Mt. Vernon would not ordinarily earn enough to pay the full interest on its income bonds and to provide a sufficient reserve to offset depreciation in its buildings and machinery. The Consolidated proposed to take over all the common stock of both the Mt. Vernon and the United States and to give $500 in par value of its preferred and $133⅓ of its common stock for each income bond of the Mt. Vernon. It had no difficulty in acquiring all the stock of the United States. The last-named company thereupon went out of existence. The Consolidated became the owner of more than 96 per cent. of the entire stock of the Mt. Vernon. The holders of the great majority of the income bonds of the latter agreed to exchange them for the stock of the Consolidated on the terms already stated.

At the time of the taking of the testimony in this case, the Consolidated held 5,758 out of the 6,000 income bonds, or about 96 per cent. of the total issue. A few of the owners of the income bonds would

not transfer them to the Consolidated. The majority of such bonds not now belonging to the latter are held by the plaintiffs. Within a year or thereabouts after the Consolidated was formed, it made up its mind to concentrate the selling of the products of both companies in the hands of a single selling agency. It selected the old established concern of J. Spencer Turner & Co., some of whose members or officers had been among its own directors. It was arranged that a new corporation to take over the Turner business should be formed under the laws of New York. It was organized under the name of J. Spencer Turner Company. It will be referred to as the "Turner." It was capitalized at $600,000. All of its stock was acquired by the Consolidated. Some reasons, certainly plausible and apparently sound, are given why one selling agent was likely to be more useful than many. In view of the chronic need for ready money of both the Mt. Vernon and the Consolidated, it is not quite so easy to understand why this large investment should have been made in the selling agent's business.

Apparently since the filing of the bill in this case, things have gone on very much as they did before. There are incidental references in the record to the subsequent formation of two new companies which in some way took over either in fact or in theory the business of the defendants. If in the multitude of corporations there is safety, the Mt. Vernon should by this time be secure. The scheme of consolidating the cotton duck industry has led to the successive formation of no less than five companies; each of the last four being intended to absorb its predecessors.

It has seemed necessary to tell the general story at this length in order to understand more clearly the position and contentions of the parties.

### Was There a Scheme to Depress the Value of the Income Bonds?

The plaintiffs seem to have been greatly disappointed at the contrast between the meager earnings of the Mt. Vernon and those which the original prospectus indicated. That contrast is marked. To the holders of the Mt. Vernon securities it must have been unpleasant. No relief is in this case sought against anybody on the ground that any of those early statements were false or fraudulent. There is nothing in the record to suggest that any of the parties to this litigation were responsible for them in any other sense than that both the Mt. Vernon and the syndicate manager, who acted as well for some of the plaintiffs as for others, gave currency to them. Doubtless many of the individuals who more or less directly indorsed these representations believed them to be true. The record does not disclose that anybody was better informed than his fellows. If any one connected with the Mt. Vernon at that time knew that they were unreliable, his identity has not been disclosed. The position of the plaintiffs is not that those statements were false and extravagant, but rather that they were substantially true. Their theory is that the Mt. Vernon has earned more interest on its income bonds than it has paid and that money which ought to have been applied to such payments has been diverted to other purposes. They base their claim for relief upon two contentions:

First, that the Consolidated wished to force the nonassenting income bondholders to exchange their bonds for its stock. They assert that it absolutely controlled the actions of the Mt. Vernon, and that it required that company so to make up its statements and to keep its books as untruly to indicate that its earnings were not sufficient to pay more interest on its income bonds than it actually did.

Second, that apart entirely from motives and intentions, the Mt. Vernon without right made certain deductions from its earnings which would otherwise have gone to the income bondholders.

My predecessor, Judge Morris, overruled a demurrer to the bill of complaint and sent the case to a special master. Much testimony has been taken before the latter. He has filed an able, painstaking, and elaborate report. He finds that the first contention of the plaintiffs, viz., that interest was withheld from the income bondholders for the purpose of depressing the value of their securities and thereby inducing them to accept the offer of the Consolidated for them, is not sustained. The plaintiffs except to such finding. It may well be that some of those who were influential in the affairs of the two companies were irritated by the opposition of the plaintiffs and those who were associated with them. They may at times have taken some pleasure in calling attention to some circumstance which seemed to show that plaintiffs had acted unwisely. They certainly were disposed to deny the plaintiffs' requests for detailed information unless the right to make such requests was too clear for argument. This attitude on their part was not altogether unnatural and not without some justification in some of the demands of the plaintiffs.

I agree with the master that there is no evidence of any fixed plan by improper bookkeeping to depreciate the value of the income bonds.

If the Mt. Vernon was sometimes required to pay money which should have come out of the treasury of the Consolidated, and if all the earnings of the Mt. Vernon which should have been used for the payment of interest on the income bonds were not so employed, the effect would, of course, have been to have depreciated unfairly the market value of such bonds.

Plaintiffs allege that such things were done. In this connection it is sufficient to say that, even if this be so, there is no reason to suppose that they were done with any special purpose or intent to lower the price of the income bonds. The plaintiffs' exceptions to this finding of the special master are therefore overruled.

#### Sums Said to have been Improperly Deducted from Earnings.

It will be convenient now to pass to the consideration of the plaintiffs' charges that money which should have been paid out as interest on income bonds has been improperly withheld either by being taken by the Consolidated or by being used by the Mt. Vernon for purposes to which it could not be lawfully applied until after interest on the income bonds had been paid in full.

There are a number of these charges. Two of them from their amount are of greater practical importance than the others.

Depreciation Reserve.

[1] One of them relates to portions of income from time to time retained by order of the directors as a reserve against depreciation. From 1901 to June 30, 1909, the aggregate amount so set aside was $639,698.23. Of this sum, however, $60,000 was subsequently used in paying interest on income bonds. The balance is $579,698.23, or about $70,000 a year. It is admitted that the average annual depreciation of the buildings, machinery, etc., of the Mt. Vernon would amount to $375,000. The sum reserved for depreciation has been $300,000 a year less than was required to maintain the company's property at its original value. Plaintiffs say that under the terms of the income bonds all this is immaterial. The interest on such bonds should have been paid in full before the directors could rightfully make any provision for depreciation. The special master has sustained their contention. He finds that the plaintiffs should have received the same proportion of the depreciation reserve of $579,698.23 as their 164 bonds bear to the 6,000 issued; that is to say, they are entitled to recover a trifle less than $15,850. To this conclusion the defendants have excepted.

The mortgage or deed of trust which secured the income bonds provided that the income applicable to pay the interest thereon "shall be so much of its (the Mt. Vernon's) total income during each six months ending December 31st and June 30th as remains after deducting all taxes, rentals, operating or current expenses and losses, necessary repairs and maintenance (including charges for depreciation by age or wear)" and the interest on the first mortgage bonds. The income bonds themselves stated that they did not "bear interest payable unconditionally but only out of the income of the company, if sufficient, realized and remaining after the payment of all taxes, rentals, operating or current expenses and losses, necessary repairs, maintenance and interest" on the first mortgage bonds. "The amount of income applicable to the payment of interest on said bonds shall be computed and declared as of January 1, 1900, and semiannually thereafter in the manner particularly provided in the mortgage securing the same." The master thought there was a clear discrepancy between the bonds and the mortgage. He accordingly held that the terms of the bonds must prevail as they were the substance, while the security was only the shadow. 2 Machen on Corporations, § 1729; 3 Cook on Corporations, § 764; Railway Co. v. Sprague, 103 U. S. 756, 26 L. Ed. 554; Chicago & I. Ry. Co. v. Pyne (C. C.) 30 Fed. 86.

But is there any clear discrepancy between the bond and the mortgage, or any discrepancy at all? The bond itself says that interest is to be paid only out of earnings realized and remaining after the payment of all taxes, rentals, operating or current expenses and losses, necessary repairs, and maintenance. This language would seem to imply that the income bondholders would not get any interest unless the company could pay it and leave at the end of the half year in its capital account property of at least as great value as it had at the beginning. If its property at the close of any semiannual period was worth less than at the opening, it had from any practical standpoint suffered losses. In order to determine whether any business has made or lost

money during any given time, it is necessary, among other things, to ascertain the value of its property at the beginning of the period and again at the end. An illustration will make this clear. In the case of this particular corporation it might in the late fall of any year assume that the price of cotton was likely to go up. It therefore might buy a year's consumption in advance. On the 1st of January if it had done so it might have had stored in a particular warehouse 10,000 bales of cotton which it did not expect to use, and, in point of fact, did not use until the next July and August. It had paid for that cotton 14 cents a pound, or $70 a bale. The cotton was on January 1st worth that price in the open market. By June 30th spot cotton had declined to 10 cents a pound, or $50 a bale. If the inventories of the company were made up properly, these 10,000 bales of cotton would have figured in its January statement for $700,000, in its July for $500,000. The difference of $200,000 would have been a business loss suffered during the six months. The effect of a diminution in value in the company's machinery or in the company's buildings is precisely the same, although it is much more difficult accurately to determine the difference in value of such property at periods removed from each other by only a few months or a year or two.

Depreciation is "an inevitable fact which no system of accounts can properly ignore." Kansas City Southern Ry. Co. v. U. S. et al., 231 U. S. 423, 34 Sup. Ct. 125, 58 L. Ed. ——, decided December 1, 1913.

From the standpoint of the plaintiffs, the most that can be said is that the bond does not clearly and unequivocally say that depreciation is to be taken into account in determining whether there were any earnings or not or how great the earnings were. The mortgage does. The plaintiffs contend that when they invested their money they looked at the former only and paid no attention to the latter. They say that an income bond, the interest on which must be paid, although such payment will render impossible any provision against depreciation, is a more attractive security than one which requires or permits such provision to be first made. From the wording of their bonds it is possible to argue that the debtor did not reserve a right to set apart an allowance against depreciation before making payment of interest. The bonds should be construed most strongly in their favor.

In passing upon the weight of this contention, it is hard to leave out of mind that the beneficial interest in most of the bonds held by the plaintiffs is still in persons who were members of the original syndicate or in those who took from such persons by operation of law. The syndicate put $6,475,000 in first mortgage and only $4,800,-000 in income bonds. A purchaser of the first mortgage issue had a vital interest in protecting the mortgaged property against depreciation. No one who simultaneously invested $647.50 in first mortgage and $480 in income bonds would have been more ready to do so if he had thought that the latter required a course of business which would so greatly imperil the security for the former.

These special considerations it may be said are applicable only to the precise circumstances under which the bonds in suit were originally floated. Apart from them, can it be contended that it is to the in-

terest of any bondholder to require his debtor to do that which will necessarily result in a steady diminution in the value of the mortgaged property? It is true that ordinary mortgages seek to bind the mortgagee to pay the interest whether he earns it or not. Yet if they are to run for many years and the property covered by them consists of widely scattered industrial plants, they will, if carefully drawn, provide that the security shall be kept up to at least its original value. In the absence of such provision, default may be avoided by paying to the creditor as interest what for all practical purposes is part of his principal. It may be doubted whether he profits thereby.

The mortgage now in question is not an ordinary one in the sense here meant. By its terms interest is not to be paid unless it has been earned. It is expressly subject to the operation of a prior lien. If interest is not paid on the latter, there will be a default. A foreclosure may follow. Interest on even first mortgage bonds cannot be indefinitely paid out of anything except earnings or profits. If a manufacturing plant is allowed to run down, if its machinery is not kept equal in efficiency to that of its competitors, it will soon cease to earn sufficient to pay interest on its first mortgage securities, especially when, as in this case, they amount on the most favorable showing to very nearly as much as the debtor's tangible assets are worth. If such a plant be sold because it has not made enough to meet the interest on its senior bonds, there will usually be little left for the holders of its junior obligations. Owners of income bonds in search of a buyer will want interest paid. They will be only secondarily interested as to whether it has or has not been earned. It is not to the public good that any securities shall thus have a fictitious and temporary value given to them. If the Mt. Vernon does not make good the steady depreciation in its property, it will not long be able to earn anything above its running expenses and the interest on its first mortgage bonds, if so much. The income bondholders will perforce have to forego their interest. They will then be in a worse position than they now are, for their ultimate security will be of less value. It must be borne in mind that their bonds are cumulative. If sufficient is ever earned, they will receive all that is now withheld from them. It is clearly to their ultimate good that the property shall be kept in a condition to make money. It is not questioned that there may be circumstances in which income bonds will be more valuable, if they require that interest shall be demandable before any sums are set aside for depreciation than if they do not. All that is asserted is that there is no presumption that such would ordinarily be the case. It is not to be assumed that it is to the interest of an income bondholder to construe ambiguous language in his bond so as to compel the debtor to pay him as if it had made more money than it had lost, when in truth and in fact the reverse was true. The mortgage in this case does not contradict the bond. It merely makes a little plainer than the bond the fact that all parties intended that whether there were or were not earnings should be determined in a way which in the long run will be best for everybody interested in the property.

The defendants' exceptions to so much of the findings and conclu-

sions of the special master as hold that the Mt. Vernon was not entitled to set apart for depreciation the sums allocated to that purpose must be sustained.

### Turner Company's Commissions.

[2] The master finds that the Turner Company has received as commissions on the goods of the Mt. Vernon sold by it the aggregate sum of $534,489.16. The plaintiffs say that no such charge could properly have been made against the Mt. Vernon. If it had not been, the earnings of the Mt. Vernon would have been greater by that amount. As the holders of 164 bonds, they would have received as interest some $14,600 more than they have. In support of this contention they point out that the Consolidated owned all the stock of the Turner and 96 per cent. of that of the Mt. Vernon. It made a contract with the Turner by which it agreed 'that for the period of ten years from the 1st day of February, 1906, the latter should be the "exclusive agent for the sale of all the products of all the mills owned by the Consolidated and of the several mills owned or controlled" by the latter at a commission of 3½ per cent. on domestic and 5 per cent. on foreign sales. The Consolidated controlled both the Turner and the Mt. Vernon. It was the sole owner of the Turner. There was no possibility of any difference between them. The Mt. Vernon had both outstanding stockholders and outstanding income bondholders whose interests were not the same as those of either the Consolidated or the Turner. The Consolidated, by exercising its power as it did to control the actions of the Mt. Vernon, made itself a trustee for the latter or for the interests other than itself in the latter. In plaintiffs' view it follows that it could not charge for its own services in selling the Mt. Vernon products.

In their bill of complaint plaintiffs charged that the Consolidated had received dividends from the Turner. No such dividends have been paid. It does appear that at some periods since the making of this contract the Turner has made considerable profits. These were applied to the reduction of its pre-existing indebtedness.

The Turner Company was originally made a defendant in this cause. Process was served upon an alleged agent of it in this district. On its motion this service was quashed on the ground that it was not carrying on business in this state. It is not therefore before the court.

The special master found that the actual commissions paid the Turner were fair and reasonable. The Mt. Vernon would have had to pay at least as much to any other selling agency. It would have saved nothing by being its own salesman. Upon this state of facts he concluded that the contract made between the Consolidated and the Turner and acted upon by the Mt. Vernon was binding upon the latter. To this conclusion the plaintiffs have excepted.

The defendants contend that the Consolidated and the Mt. Vernon are in law separate entities. They may lawfully contract with each other. It should be borne in mind, however, that so far as this record discloses there never was any contract between the Mt. Vernon and the Consolidated or between the Mt. Vernon and the Turner as to this selling agency. What actually took place was in form at least

different, and in theory was governed by other legal principles. The Consolidated itself agreed with the Turner that the latter should for ten years be the sole selling agent of the Mt. Vernon and 'should receive for performing the duties of such agency a stipulated compensation. Upon the assumption so strenuously contended for by the defendants, that the three corporations were distinct and could, within the limits of their respective corporate powers, deal with each other as any three natural persons might have done, the Consolidated put itself in such a position that for a decade it had either to exercise its voting control to compel the Mt. Vernon to employ the Turner to sell its goods, or else to become liable to the Turner for a breach of its contract.

Such an agreement, the Supreme Court has said, is contrary to public policy and void. West v. Camden, 135 U. S. 507, 10 Sup. Ct. 838, 34 L. Ed. 254.

The other persons interested in the Mt. Vernon were entitled at all times to the exercise by the Consolidated of a fair and unbiased judgment as to whether it was to the advantage of the Mt. Vernon to continue such arrangement with the Turner. The Consolidated could not be permitted to make a bargain by which its duty to the minority in the Mt. Vernon might require it to take action which would be contrary to its own individual interests under the contract.

It may be said that there can be no such conflict in the case under consideration. So long as the Consolidated owns all the stock of the Turner, and the latter remains solvent, there is no real possibility of its being sued for breach of the contract. For all practical purposes the Turner while solvent is a mere agency through which the Consolidated carries on a part of its business.

In its agreement with the Turner it suited the Consolidated to act, or at all events to speak, as if the Turner were a separate and distinct entity with whom it could enter into binding contractual obligations. At that time and for that purpose it equally pleased it to ignore the corporate existence of the Mt. Vernon altogether and to contract precisely as it would have done had it itself owned all the mills of the last-named company.

Plaintiffs contend that if the Consolidated, whenever it found it convenient, ignored the distinctions between the corporations, it may not set them up whenever it finds it useful so to do.

In this case it is unnecessary to pass on a question of such difficulty. It is sufficient that the law is well settled that all contracts between the Mt. Vernon and the Consolidated or between the Mt. Vernon and any corporation, all of whose stock is owned by the Consolidated, are to be scrutinized, if not with distrust, yet with a large measure of watchful care. Richardson v. Greene, 133 U. S. 43, 10 Sup. Ct. 280, 33 L. Ed. 516.

The Supreme Court has declared that the doctrine that the courts will view with jealousy such contracts is founded on the soundest morality. Twin Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328.

From the record it does not appear that up to the time of filing the bill of complaint in this cause, which somewhat to the reproach of the

law is now more than four years ago, the Consolidated had actually received into its treasury any money or any money's worth as a result of the contract made by it with the Turner Company. It may be that the value of its stock in that company has appreciated, or the reverse may be true. The record does not disclose. In this connection the court cannot close its eyes to the fact that we do not know what profit the Turner has made out of this contract because the latter set up its exemption from suit in this district. As all the stock of the Turner is admittedly owned by the Consolidated, its action in making such a defense could not have been displeasing to the latter. The Consolidated has withheld light which it might have thrown upon this much controverted transaction.

Under all the peculiar circumstances of this case inquiry should not stop with the mere ascertainment of the fact that the charge made to the Mt. Vernon was not above the market rates for similar services. The fiduciary relation here existing is so close that more should be known.

It does not follow that the plaintiffs are entitled to the relief for which they ask. In any event, it would have cost the Mt. Vernon an appreciable sum to have sold its goods, whether it had sold them directly or had employed a number of agents for the purpose. In order to sell them the Turner must have laid out a substantial amount. All the commissions it received were not clear profit.

Plaintiffs cite and rely upon the rule that a trustee who undertakes himself to sell trust property may not charge anything for the trouble or even for the personal expense to which he has been put in making the sale. The analogy between the cases in which that principle has been applied and the one now under consideration is not close enough to make them necessarily binding here. A court of equity should always seek to do actual justice. It is only under compulsion of some general and imperative rule of public policy that it will impose penalties or enforce forfeitures.

Those in control of a corporation made a contract with themselves to work for it at highly excessive prices. The agreement was set aside. The court, however, awarded the offenders fair compensation for what the corporation received. Thomas v. Brownville R. R. Co., 109 U. S. 526, 3 Sup. Ct. 315, 27 L. Ed. 1018.

The master's finding that on the record as it now stands it is not affirmatively shown that at the time suit was brought the Consolidated owed the Mt. Vernon anything on account of the commissions deducted by the Turner from the proceeds of the sale of the goods of the Mt. Vernon is correct. The exceptions to it must therefore be overruled, but from what has been said such action must be without prejudice to the right of the plaintiffs in this or other proceedings to recover their share of whatever portion the Mt. Vernon may be ultimately held equitably entitled of any profit which the Consolidated through its ownership of the Turner stock may realize out of the commissions received from the sale of the Mt. Vernon's goods. It may make little difference whether the Consolidated obtains these profits in the shape of dividends upon its Turner stock or in the en-

hanced price at which it may sell that stock in consequence of the improved financial condition of the Turner resulting from the receipt by it of the commissions in question. Until such profits have been actually realized, it will be premature to discuss how to state an account dealing with them. Many questions will necessarily arise concerning it. It may or may not be necessary then to inquire whether the capital which the Consolidated put into the Turner was actually required to enable the Turner efficiently to discharge its duties as sales agent, and, if so, if any allowance should be made to the Consolidated for the use of such capital.

### Burden of Proof as to Propriety of Particular Deductions from Earnings.

[3] There are a number of items of expenditure charged against the earnings of the Mt. Vernon upon its books which are attacked by the plaintiffs. The special master has found that the burden of showing that they are improper charges is upon the plaintiffs. They have excepted to this finding.

It is hard to lay down any general rule upon this subject. It is clear that the plaintiffs cannot require the defendants affirmatively to prove the propriety and good faith of every one or even of many of the numberless charges against the Mt. Vernon's earnings which are to be found on its books. They have not attempted to do anything of the kind. They have assailed a few specific items, less than a dozen in number. The facts as to some of these would seem to be within the knowledge of the defendants. It would appear to be easy for them to put on the stand witnesses who could in a few minutes clear up all questions of fact concerning them. The plaintiffs seem in good faith to have tried to find out their true history. The defendants do not appear to have thought that it was any of their duty to aid in so doing. Throughout the case they have as a rule preferred to stand on what they have conceived to be their technical rights. If the relations among these corporations had been different from that which in fact they were, had each one of them dealt with the others at arms length, and had the Consolidated not held an overwhelming majority of both the stock and the income bonds of the Mt. Vernon, this attitude would have given no occasion for remark much less for criticism.

Under the conditions actually existing, it would seem to have been the duty of the defendants to make clear the nature and history of the few charges actually attacked or to show that lapse of time, death of all the persons having first-hand information, or other causes, had made it impossible now to do so.

### Tallassee Dam Repairs.

These challenged items will be separately considered. From the papers in evidence it appears that one of the company's dams had been damaged or destroyed by a flood. It had to be repaired. It is to be regretted that defendants did not see fit to put on the stand some one who could in a few minutes have told the whole story of this dam and of the occasion for the repairs to it. Nevertheless, on the record as it stands, the master was justified in holding that the entries on the Mt.

Vernon books of sums expended upon this dam were proper charges against earnings.

### West Point Contract Forfeit Charges.

When the United States was organized, it acquired an option on the West Point mills. For some time it operated them. It lost money in so doing. Those losses were entered upon its books. A portion of them aggregating $26,267.25 were subsequently charged to the Mt. Vernon and paid by it. The plaintiffs' share of this sum would be only $717.97. Nevertheless the burden of showing that the Mt. Vernon was liable for it was upon the Consolidated, which had taken over the liabilities of the United States with its assets. The exceptions to the master's finding that this item was a proper charge must be sustained.

### Cotton Options.

The master held that the Mt. Vernon had been improperly charged with $21,739.10 in excess of its share of the losses on certain cotton options which had been carried for the mutual protection of the United States and the Mt. Vernon. The plaintiffs' proportion of this sum would be $594.20. Defendants' exception to this finding must be overruled.

### Officers' Salaries.

From 1906 to 1909 the salaries of some of the officers of the Consolidated were charged to and paid by the Mt. Vernon. The master finds that during that period the companies were closely associated. The duties of their respective officers necessarily overlapped. The companies apportioned the total expenditure for this purpose of both of them between themselves upon the basis of the total production of each company. The plaintiffs except to the master's finding that what was done in this respect should not now be disturbed. With much hesitation I overrule this exception. What in this respect took place illustrates the practical impossibility of keeping separate the affairs of the two companies. The Mt. Vernon was in fact conducted as a mere operating department of the Consolidated. Despite legal theory, it must sometimes be treated as such; a position which the defendants have in this connection in effect taken.

### Interest Charges.

The Mt. Vernon was a borrower. It paid from 4½ to 6 per cent. for the money it obtained from outsiders. A good deal was lent to it by the Consolidated. For these sums it always paid at the rate of 6 per cent. The Consolidated itself frequently borrowed money, usually at a less rate than that it charged the Mt. Vernon. The master finds, however, that there is no evidence that it ever borrowed at a rate less than 6 per cent. and lent that same money to the Mt. Vernon at 6. The Consolidated doubtless could show what interest it did pay for the money it let the Mt. Vernon have. It was almost impossible for the plaintiffs to do so. If the matter was of greater importance than it is, I should be reluctant to dispose of it, as the master does, upon a ruling as to the burden of proof. The total amount of interest paid by

the Mt. Vernon to the United States and the Consolidated was $139,-497.73. It is not likely that it cost the lenders themselves much less than 5¼ per cent. on the average. If so, their aggregate profit from the 6 per cent. paid by the Mt. Vernon would have been less than $17,-500. The plaintiffs' share of this, if refunded, would be under $500. It doubtless would cost at least that much accurately to ascertain the facts. The transaction may be open to criticism. It does not on the whole seem wise to disturb the master's conclusions concerning it.

### New Carding Machinery.

The Mt. Vernon spent $116,451.03 for new carding machinery. It assumed the right to pay for it out of earnings in preference to the payment of interest on the income bonds. It could be wished that defendants had given a fuller explanation of the circumstances. From what is before the court the master would seem to be right in holding that it was such a replacement of machinery as was justified by the terms of the mortgage. Even if it were to be treated as an additional allowance for depreciation, the amount which has been set aside for that purpose would still be far less than it should have been.

### Default in the Mortgage.

From what has been said it follows that certain sums which should have been long since paid the plaintiffs have been withheld from them. They assert that as a consequence the mortgage is in default. The amounts due the plaintiffs are relatively very small. The decree may provide that if paid within a limited time after its date, or after any date to which its operation may by appeal and supersedeas be suspended, the default will be set aside.

### Retaining Jurisdiction.

In their bill of complaint the plaintiffs ask the court, if it does not direct a sale of the mortgage property, to decree that the Consolidated and the Mt. Vernon be adjudged to hold all of the properties of the Mt. Vernon in trust for the holders of the income bonds. The court is requested to assume jurisdiction of the trust and to require the defendant companies to file with it at stated times full and proper accounts of the operations of the properties by them, showing their receipts and expenditures and the application of revenues of the Mt. Vernon in order that the true amount of income applicable to the payment of interest payable on said bonds may at all times be known to and received by the holders of such bonds. The master finds that the plaintiffs are entitled to this relief. To this finding the defendants have excepted. Many of the provisions of the original mortgage for the protection of the holders of income bonds have become inapplicable to the situation which now exists, 5,758 of the 6,000 income bonds are owned by the Consolidated. It owns practically all of the capital stock of the Mt. Vernon. The mortgage contemplated that the great mass of the bonds would be held during its life by persons who in fact were creditors of the Mt. Vernon. 96 per cent. of them are now owned by a corporation whose interests are identical with those of the debtor. If the 5,758 bonds belonging to the Consolidated are

to be treated as outstanding, the holders of the other 242 bonds are helpless to avail themselves of such of the protective privileges of the mortgage as may be exercised by not less than 25 per cent. of the bonds. If, on the other hand, those held by the Consolidated are to be excluded altogether, the situation will be very different from that which was originally contemplated by any of the parties to the mortgage. The requirement for indemnity to the trustee, which might be reasonable enough when it was an obligation to be borne by the holders of income bonds of the par value of at least a million and a half, might be very burdensome if imposed upon the holders of securities of the par value of $61,000.

The record in this case shows how hard it is properly to keep the accounts of two companies which stand in such relation to each other as that borne by the Mt. Vernon to the Consolidated, even assuming that everybody connected with either is entirely free from any consciously improper motive. It will be practically impossible for the laymen who carry on the affairs of such corporations always to act in accordance with the right legal theory or indeed with any consistent one.

As has already been said, the position in which the Consolidated has placed itself to the Mt. Vernon is one which the courts are bound to scrutinize with jealous care.

This appears to be a case in which it is best that an impartial tribunal should retain jurisdiction in order that disputed questions of accounting may be from time to time promptly and cheaply disposed of. Stewart v. Chesapeake & Ohio Canal Co. (C. C.) 5 Fed. 149.

### Disposition of the Exceptions to the Master's Report.

It follows that the plaintiffs' first, second, third, fourth, seventh, ninth-A, tenth, and eleventh exceptions must be overruled. Their eighth, ninth-B, and fourteenth should be sustained. It does not seem necessary to rule upon the remaining exceptions of the plaintiffs otherwise than in this opinion has been done. They involve general statements of law sound enough under particular circumstances, but seemingly more or less inapplicable to the facts of this case.

The court having held that the Mt. Vernon was entitled, before paying interest on income bonds, to set aside the sums it did set aside for depreciation, the first five exceptions of the Mt. Vernon are to that extent sustained. In so doing it is not intended to express concurrence in everything found in such exceptions. It is sufficient to decree that the plaintiffs are not entitled to complain of the depreciation charges.

The Mt. Vernon's sixth, seventh, eighth, ninth, and tenth exceptions appear to be well founded. They are sustained, although in the view which had been taken of the questions involved those findings have become immaterial.

The eleventh and twelfth exceptions of the same defendant are overruled.

The thirteenth and fourteenth are sustained, and the fifteenth is overruled.

The first and sole exception of the Consolidated is overruled.

The objection of the defendants to the jurisdiction of the court ·on the ground that the plaintiffs are not entitled to sue herein, and their contention that the plaintiffs are barred by laches, have not been lost sight of. Judge Morris was of opinion that the plaintiffs were the holders of the bonds in such sense as entitled them to sue thereon. In that view I concur. Those other than themselves who were beneficially interested in the bonds were entitled, if they had wished, to sue in their own names. The bonds were not placed in the hands of the plaintiffs in an attempt to create a jurisdiction which would not otherwise have existed.

Whatever merit there might have been in the defense of laches as an answer to the claims of the plaintiffs that no depreciation reserve could be properly created, there would seem to be none with reference to the matters upon which the plaintiffs have been held entitled to relief.

A draft of decree in accordance with the views herein expressed may be presented. If the parties. cannot agree upon its terms, an early day for settling them will be fixed.